# JOSHUA S. BOND and LAURA BOND, his wife,

## *v.*

## EBEN B. LOCKWOOD.

1. GUARDIAN AND WARD — *powers and duties, rights and liabilities of guardians, under the statute and at common law.* The statute, in relation to guardians, does not constitute a complete Code, but confers upon the County Court, power to appoint guardians and to regulate their conduct in accordance with their duties at common law. Many of the powers and duties, rights and liabilities of guardians are not specifically defined by statute. It contains such provisions as were necessary to define the nature of the jurisdiction conferred, prescribe the manner of its exercise, and correct some of the defects of the law as it then existed. In other respects the common law, regulating the powers and duties, rights and liabilities of guardians, is left in force.

2. GUARDIANS *held accountable at common law.* At common law all guardians were regarded as trustees, clothed with such powers and rights as were necessary for the proper execution of the trusts imposed upon them, and they were held accountable for the faithful discharge of their duties. All except the guardian in chivalry, might be compelled in a court of chancery to render an account, before, as well as after, the guardianship terminated.

3. POWER OF COUNTY COURTS *to compel guardian to account.* The powers of the County Court to compel guardians to render an account of their guardianship from time to time, are coëxtensive with those of a court of chancery.

4. The accounts are to be rendered upon oath, and the court may require their settlement. The court may allow or disallow an account in whole or in part, and for that purpose may examine witnesses, may require the production of vouchers, and do all other acts necessary to enable it to arrive at a correct conclusion as to

whether or not the account ought to be allowed. When allowed it is required to be entered of record.

5. ALLOWANCE OF GUARDIAN'S ACCOUNT BY COUNTY COURT—*prima facie evidence of its correctness.* The allowance of a guardian's account is a judicial act, and although it is necessarily made during the minority of the ward, still it is to be presumed the act was properly performed, until the contrary appears. It is *prima facie* evidence of the correctness of the account allowed. The authority of the County Court in this regard is similar to that of a court of chancery.

6. SUCH ALLOWANCE NOT CONCLUSIVE—*burthen of proof.* If an account has been stated erroneously, the ward may have it restated correctly. If the guardian has omitted to charge himself with anything, or with a proper sum, the ward may make additional charges of such matters. If the guardian has obtained an allowance in his account apparently regular upon its face, the ward should be required to rebut the *prima facie* presumption of its regularity, before the guardian can be called upon to establish its correctness; but if it appears from the face of the account that items were improperly allowed, no such presumption will sustain them.

7. GUARDIAN'S DUTY—*as to possession of ward's property.* At common law the guardian was required to take possession of his ward's property, and he was not only liable for such property as actually came into his possession, but for such as he might have taken possession of by the exercise of diligence and without any willful default on his part.

8. GUARDIAN'S DUTY—*as to rents and profits and income of the ward's estate.* So in regard to the rents and profits of the ward's lands and tenements, and the income from every species of his property, the guardian was chargeable with what he actually received and with what he might have received had he faithfully discharged his duties.

9. GUARDIANS CHARGEABLE WITH WASTE—*and herein what constitutes waste.* And guardians were chargeable with waste committed or suffered by them. In England it was considered waste to cut growing trees, or to permit them to be cut. Any act or omission which diminished the value of the estate or its income, or increased the burthens upon it, or impaired the evidence of title thereto, was considered waste.

10. Many acts which in England would be waste are not such here in consequence of the difference in the condition of the two countries. In this country, whether the cutting of any kind of tree is waste, depends upon the question whether the act is such as a prudent farmer would do, having regard to the land as an inheritance, and whether the doing of it would diminish the value of the land as an estate.

11. In this case it appeared that the guardian cut the trees upon about six acres of land belonging to a farm of the wards; that the trees were of no great value, and the cutting of them did not diminish the value of the lands; besides, the guardian accounted for what he received for the wood. He was held not to be chargeable with waste.

12. MONEY OF WARD MUST BE PUT AT INTEREST — *and upon what terms.* Guardians are not allowed to make gain to themselves of trust property in their hands. They are required to put on interest the moneys of their wards upon mortgage security.

13. In this State the statute requires the letting to be for one year, and that the interest shall be added to the principal at the end of each year, and the security is required to be approved by the County Court.

14. GUARDIAN LIABLE FOR NEGLECT IN THIS RESPECT — *and from what time.* If a guardian neglects his duty in this respect he will be chargeable with interest after a reasonable time has elapsed within which to make the investment. Six months from the receipt of the money has been deemed a reasonable time for that purpose.

15. WHEN GUARDIAN USES THE TRUST FUND — *extent of his liability.* And where a trustee or guardian employs trust funds in a trade or adventure of his own, whether he keeps them separate or mixes them with his own private moneys, and notwithstanding difficulties may arise in the latter case in taking the account, the *cestui que trust,* if he prefers it, may insist upon having the profits made by, instead of interest upon the amount of, the trust funds so employed.

16. It is sometimes impracticable, in applying this rule, to trace out and apportion the profits derived by a trustee from the employment of trust funds along with his own, and in such cases the court fixes upon a rate of interest as the supposed measure or representative of the profits, and assigns it to the trust fund.

17. In this case the guardian employed the money of his wards in his business as a merchant, but no data was furnished from which an apportionment could be made between the capital and the labor and skill bestowed in the prosecution of the business. So a rate of interest was fixed upon as a representative of the profits to which the ward would be entitled.

18. The legal rate of interest in this State is six per cent. per annum, and although parties are allowed to contract for any rate not exceeding ten per cent., courts cannot allow more than six per cent., where it has not been specifically agreed upon.

19. The guardian should render to the County Court yearly accounts, and where he has used the money of his ward he should charge himself with interest from the time he received it. At such rendering of an account the interest should be made a part of the principal, and interest computed on the balance in the guardian's hands up to the next annual rendering of his account.

20. EXPENDITURES BY GUARDIAN — *when an order therefor necessary.* It is the duty of a guardian to procure an order of the proper court before making expenditures; and that duty existed as well before the passage of the statute imposing such obligation upon him as afterwards.

21. A guardian may support his ward without any order of court, and all payments which he can show were necessary for that purpose will be allowed to him. Any one in possession of the ward's property, or a stranger, may do it and

have a like allowance; but it will only be made upon proof showing the necessity of the expenditure, and for what it was made.

22. Expenditures not required for necessaries should be approved by the court before they are made.

23. In determining what expenditures are necessary or proper, courts are exceedingly jealous of encroachments upon the principal of the ward's estate, and in reference to them it has been repeatedly held that they will not be allowed, except for necessaries, without an order of court is procured before making the expenditure, unless the guardian can show such a state of facts as would have entitled him to the order had he applied for it at the proper time, and a reasonable excuse for his neglect in that regard.

24. In this State it has not been usual to procure orders of court for prospective maintenance, but such orders have been uniformly required for expenditures other than for necessaries, and such expenditures, whether from income or principal, should be disallowed unless a reasonable cause is shown for not obtaining the proper order at the proper time.

25. EXTENT OF EXPENDITURES FOR WARD — by what circumstances controlled — gift by guardian to his ward cannot be recalled. Where a guardian has made a gift to his ward and entered a credit to the ward in his account therefor, the County Court, in view of it, may, with great propriety, allow larger expenditures in behalf of the ward than it would otherwise do; and where such appears to have been the case it would be a gross fraud to allow the guardian to recall the gift.

26. STEP-CHILDREN — step-father not bound to support them — presumption when step-father is their guardian. A party is not required by law to board the children of his wife by a former marriage without compensation. He may receive them into his family under such circumstances as to create a presumption that he is to board them gratuitously; but where a step-father receives children into his family as their legally appointed guardian, and as such renders his account for expenditures from year to year, and such accounts are allowed by the County Court, the presumption does not arise.

27. GUARDIAN'S COMMISSIONS — when allowed and when not. Commissions will not be allowed to a guardian for money of his ward in his hands which he has employed in his own business. Commissions are allowed to guardians for services rendered, and not for neglect of their duties.

APPEAL from the Circuit Court of Clinton county; the Hon. SILAS L. BRYAN, Judge, presiding.

This was a suit in chancery instituted in the court below by Joshua S. Bond and Laura Bond, his wife, against Eben B. Lockwood, to compel him to render an account as guardian of the complainant Laura. The Circuit Court entered a decree in favor of the complainants for the sum of $766.33, from which

they took this appeal to the Supreme Court in the First Grand Division; but by agreement of parties, the cause was afterwards removed upon change of venue into the Second Grand Division, where it was finally decided.

. The case is sufficiently stated in the opinion of the Court.

Mr. H. K. S. O'MELVENEY, for the appellants.

Messrs. BUXTON & WHITE and W. H. UNDERWOOD, for the appellee.

Mr. JUSTICE BECKWITH delivered the opinion of the Court:

On the 9th day of October, 1850, the appellee was appointed by the County Court of St. Clair county, guardian of Laura Hart (then between six and seven years of age), and of Lewis Hart (then about five years of age), the children of his wife by a former husband. Lewis Hart died on the 8th day of August, 1854; Mrs. Lockwood, the mother of the two children, died intestate August 26, 1854; Laura married Joshua S. Bond on the 18th day of October, 1860, and after she had arrived at the age of eighteen years, she and her husband filed their bill against the appellee for an account.

The bill alleges that the appellee received various sums of money belonging to his wards; and that they were the owners of a farm from which he, from time to time, received as rent various other sums of money. That on the death of Mrs. Lockwood, the appellee relinquished his claim, as being next of kin to his wife as to the share to which she was entitled as next of kin, to Lewis Hart, and gave Laura credit for, and allowed to her such share in his account rendered to the County Court. That appellee had neglected to put his wards' money upon interest when he might have done so at the rate of ten per cent. per annum; and had used the same for his own benefit in mercantile business and made large profits out of the same. That the appellee rented the farm for a sum less than he might have obtained therefor, and committed waste by cutting down growing trees and suffering an orchard to be destroyed. The bill

further alleges that the appellee wrongfully seeks to charge his wards with divers sums of money expended in their nurture and education, without having procured from the County Court any order for such expenditures; that many articles of the appellee's account are charged at exorbitant prices; and that he has charged Laura for board when she was of an age and ability to earn, and did earn, the same by services rendered in his family.

The appellee, by his answer, admits that he received various sums of money belonging to his wards, amounting to $1,130.92; from the sale of lands the further sum of $255.35; and for rent of their farm, from year to year, the sum of $2,908.31. The answer sets forth an account against Lewis Hart for expenditures on his behalf of $529.45, and an account against Laura Hart for expenditures on her behalf of $2,424.79, in which she is credited with $571.12 for moneys in the appellee's hands belonging to Lewis Hart at his decease; that these accounts were rendered to the County Court of St. Clair county in November, 1853, and yearly thereafter, and were approved; that in the accounts the appellee charged himself with interest, at six per centum per annum, upon all moneys in his hands, making rests whenever the accounts were rendered. The answer denies the relinquishment of the appellee's claim as next of kin to his wife to the share she was entitled to as next of kin to Lewis Hart, and the allegations of waste. It admits that the appellee did not loan the moneys of his ward, and that he used the same in his own business. From the evidence it appears that the accounts of the appellee were rendered and approved of, as is stated in the answer.

The conclusion to which we have arrived renders an examination, regarding many items of these accounts, unnecessary. For example, the articles charged as having been furnished the wards are such as were suitable and proper for persons in their condition in life; and there is no evidence that the prices at which they were charged were exorbitant. The approval of a County Court of a guardian's accounts, regular upon their face, is *prima facie* evidence of their correctness. The authority of the County Court in this regard is similar to that of a

court of chancery. The provisions of the statute in relation to guardians were not designed as a complete code, but were enacted' to confer upon the county court power to appoint guardians, and to regulate their conduct in accordance with their duties at common law. Some imperfections in the common law were remedied, and a more simple and convenient mode of procedure was introduced. While some of its provisions were declaratory of the common law, and were appropriately introduced in conferring jurisdiction upon a new tribunal, it is evident that many of the powers and duties, rights and liabilities of guardians are not, by the statute, specifically defined. The statute contains such provisions as were necessary to define the nature of the jurisdiction conferred, prescribe the manner of its exercise, and correct some of the defects of the law as it then existed. In other respects, the common law regulating the powers and duties, rights and liabilities of guardians, was left in force. At common law all guardians were regarded as trustees, clothed with such powers and rights as were necessary for the discharge of the trusts imposed upon them, and they were held accountable for the faithful discharge of their duties. They were liable to be proceeded against for neglect of duty in the common law court, and courts of chancery from since the earliest times have exercised their jurisdiction to compel the discharge of the obligations which by law devolved upon them. A guardian in chivalry who became such upon the death of his tenant, holding by knight's service, had the custody of the person of the minor, and the right to take to his own use all the profits of his ward's land, inasmuch as he had to provide a substitute to perform the service due from the tenant, but he was bound to provide for the nurture and education of his ward and restore to him his lands when the guardianship terminated. A guardian in socage, who was the nearest relative of the minor to whom the inheritance could not possibly descend, was required to take charge of the lands of his ward; and was liable to account for whatever he received or might, but for his own willful default, have received from them. He was also bound to provide for the nurture and education of his ward, and was

entitled to allowance of reasonable costs and expenses. Coke on Litt. 87, b. Guardians by the customs of Kent and of the manor, guardians by the custom of London and other cities and boroughs, guardians by election, such as was the guardian of Lord Baltimore, guardians appointed by the Ecclesiastical Court, strangers who entered upon the lands of minor, guardians *per cause de ward*, testamentary guardians appointed under the provisions 4 and 5 in Phil. and Mar. c. 8, and of 12 Car. II, c. 24, and guardians appointed by courts of chancery, were all compellable to render an account; and all of them excepting the guardian in chivalry might be compelled in a court of chancery so to do before, as well as after the guardianship terminated. Macpherson on Infants, 40, 108, 259. Even the guardian in chivalry might be removed for neglect of duty (Macpherson on Infants, 13; 2 Ch. Cases, 237; 1 Spence, 611), and the only reason why he could not be required to render an account was that the profits of the land were his own. The powers of the County Court to compel guardians to render an account of their guardianship from time to time are coëxtensive with a court of chancery. The accounts are to be rendered upon oath and the court may require their settlement. 1 Purple's Stat. 595; 2 id. 844.

The court may allow or disallow an account in whole or in part, and for that purpose may examine witnesses, may require the production of vouchers, and do all other acts necessary to enable it to arrive at a correct conclusion as to whether or not the account ought to be allowed. When allowed it is required to be entered of record. Laws of 1859, p. 94. The allowance of a guardian's account is a judicial act, and although it is necessarily made during the minority of the ward, *ex parte*, still we are to presume that the act was properly performed until the contrary appears. It is *prima facie* evidence of the correctness of the account allowed. If an account has been stated erroneously, the ward may have it restated correctly. If the guardian has omitted to charge himself with anything, or with a proper sum, the ward may make additional charges of such matters. If the guardian has obtained an allowance in his

account apparently regular upon its face, the ward should be required to rebut the *prima facie* presumption of its regularity before the guardian can be called upon to establish its correctness; but if it appears from the face of the account that items were improperly allowed, no such presumption will sustain them. In accordance with these general principles the appellee's account will be examined.

At common law the guardian was required to take possession of his ward's property, and he was not only liable for such property as actually came into his possession but for such as he might have taken possession of by the exercise of diligence and without any willful default on his part. So, in regard to the rents and profits of the ward's lands and tenements, and the income from every species of his property, the guardian was chargeable with what he actually received and with what he might have received had he faithfully discharged his duties. In the application of these principles, guardians were frequently charged with waste committed or suffered by them. In England, where good husbandry required the preservation of growing trees, it was considered waste to cut or permit them to be cut. Any act or omission which diminished the value of the estate or its income, or increased the burdens upon it or impaired the evidence of title thereto, was considered waste. Many acts which in England would be waste are not such here in consequence of the difference in the condition of the two countries. In this country, "whether the cutting of any kind of trees is waste "depends upon the question whether the act is such as a pru-"dent farmer would do, having regard to the land as an inher-"itance, and whether the doing of it would diminish the value "of the land as an estate." 1 Wash. on Real Prop. 108. The evidence in this case shows that the trees upon about six acres were cut; that they were of no great value, and that the cutting of them did not diminish the value of the lands. The appellee has accounted for what he received for the wood. There is no evidence showing any waste in regard to the orchard; and the appellee should not be charged with waste in these respects.

It is a well settled rule of courts of chancery that guardians

shall not be permitted to make gain to themselves of trust property in their hands. They are required to put on interest the moneys of their wards upon mortgage security. Dayton on Surr. 521; *Bogart* v. *Van Velsor*, 4 Edw. Ch. 722. In this State the statute requires the letting to be for one year, and that the interest shall be added to the principal at the end of each year, and the security is required to be approved by the County Court. The appellee neglected to discharge his duty in this respect, and for such neglect of duty he would have been chargeable with interest after a reasonable time had elapsed in which to make the investment. Six months from the receipt of the money has been deemed a reasonable time for that purpose. Dayton on Surr. 533. The appellee, however, used the money of his wards in a mercantile business in which he was engaged; and it is a well established rule that where a trustee employs trust funds in a trade or adventure of his own, whether he keeps them separate or mixes them with his own private moneys, and, notwithstanding difficulties may arise in the latter case in taking the accounts, the *cestui que trust*, if he prefers it, may insist upon having the profits made by, instead of interest upon the amount of, the trust funds so employed. *Docker* v. *Somes*, 2 Myl. & K. 655; *Willett* v. *Blandford*, 1 Hare, 253. In the application of this rule to the varied transactions of business it is sometimes impracticable to trace out and apportion the profits derived by a trustee from the employment of trust funds along with his own, and in such cases the court fixes upon a rate of interest as the supposed measure or representative of the profits, and assigns it to the trust fund. *Jones* v. *Foxall*, 15 Beav. 392. Although the rate of interest thus fixed by courts as the representative of profits may not be exact theoretical justice between the parties, it is the nearest approximation thereto that courts are able to arrive at. A trust fund might be invested in raw materials, and they worked up into goods of the finest fabric, where the work would exceed the value of the materials by a thousand times. The enhanced value in such a case would be solely attributable to the skillful labor bestowed upon them. It would be impracticable under such

circumstances to trace out and apportion the profits between the capital and the labor. The appellants have furnished no data from which a court can make such an apportionment, or even determine whether it would be practicable or not in the present case.

There is no evidence of the extent of the appellee's business, of the amount of capital employed, of the skill, judgment and credit required in its transaction, nor of the expenses or losses. We are therefore compelled to fix upon a rate of interest as a representative of the profits which the ward would be entitled to. The legal rate of interest in this State is six per cent. per annum, and although parties are allowed to contract for any rate not exceeding ten per cent., courts cannot allow more than six per cent. where it has not been specifically agreed upon. The guardian should render to the County Court yearly accounts, and where he has used the money of his ward he should charge himself with interest from the time he received it. At such rendering of an account the interest should be made a part of the principal, and interest computed on the balance in the guardian's hands up to the next annual rendition of his account. We are satisfied that this mode of stating an account between a guardian and his ward, under such circumstances, will result in practical justice. The ward runs no risk from an investment. His money is at no time idle, and he pays no commissions for investing, collecting and reinvesting, and no expenses attendant thereon. The mode has been approved by the most enlightened jurists (*Schiefflen* v. *Stuart*, 1 Johns. Ch. 620; *Wright* v. *Wright*, 2 McCord Ch. 185; 2 Kent's Com. 231, *n.* [*c.*]; Harland's Accounts, 5 Rawle, ), and places the ward in the condition, as nearly as may be, in which a conscientious discharge of the trust would have placed him. The guardian cannot reasonably object to it. His duty requires that he should make the interest a part of the principal at the end of each year. Having used the money, he may justly be regarded as a borrower upon such terms as will discharge his duty to his ward. This rule was adopted in *Rowan* v. *Kirkpatrick*, 14 Ill. 1. The appellee

charged himself with interest substantially in accordance with the principles we have enunciated.

The expenditures of the appellee for the benefit of his ward were made without first procuring an order of the County Court for that purpose. The duty of a guardian to procure an order of the proper court before making expenditures, existed as well before the passage of the statute imposing that obligation upon him as afterwards; and the consequences of its neglect were well settled. A guardian may support his ward without any order of court, and all payments which he can show were necessary for that purpose will be allowed to him. Any one in possession of the ward's property, or a stranger, may do it and have a like allowance (Macpherson on Infants, 213), but such allowance will only be made upon proof, showing the necessity of the expenditure and for what it was made. A minor has power to contract for necessaries, and we see no reason why he may not become indebted to his guardian for them as well as to a stranger. Expenditures not required for necessaries should be approved by the court before they are made. *Davis* v. *Harkness*, 1 Gil. 173; *Cummins* v. *Cummins*, 29 Ill. 452. In England it was usual to obtain from the proper court an order allowing a certain sum for prospective maintenance. Its amount depended upon the fortune, position and necessities of the ward, and it was to be expended for all purposes proper for expenditures to be made by or for a minor; and not unfrequently allowances were made for the support of a minor's father and mother. If no such order was procured, a guardian was only allowed for necessary expenditures actually made. *Bruin* v. *Knott*, 1 Ph. Rep. 572. In determining what expenditures are necessary or proper, courts are exceedingly jealous of encroachments upon the principal of the ward's estate, and in reference to them it has been repeatedly held that they will not be allowed, except for necessaries, without an order of court is procured before making the expenditure, unless the guardian can show such a state of facts as would have entitled him to the order had he applied for it at the proper time, and a reasonable excuse for his neglect in that regard. In this State it has not

been usual to procure orders of court for prospective maintenance, but such orders have been uniformly required for expenditures other than for necessaries; and such expenditures, whether from income or principal, should be disallowed unless a reasonable cause is shown for not obtaining the proper order at the proper time. The board and clothing charged to the wards in appellee's account were necessaries, and the presumption is that they were properly allowed by the County Court. The evidence adduced does not rebut that presumption. The appellee was not required by law to board the children of his wife by a former marriage without compensation, nor was his wife obliged so to do. He might have received them into his family under such circumstances as to have created a presumption that he was to board and clothe them gratuitously (*Brush* v. *Blanchard*, 18 Ill. 46), but where a step-father receives children into his family as their legally appointed guardian, and, as such, renders his account for expenditures from year to year, and such accounts are allowed by the County Court, the presumption does not arise. The other items of appellee's account are proper expenditures for a ward; and the presumption is that they were not allowed by the County Court without proof of their propriety and of a satisfactory excuse for not procuring an order for making them before they were made.

The credit in appellee's account of moneys in his hands belonging to the estate of Lewis Hart, at his decease, should remain as credited. For aught we know, the large expenditures for education and dress in the account were allowed on the ground of the gift which the appellee made to his ward. The County Court, in view of it, might with great propriety have allowed larger expenditures than it would otherwise have done, and it would be a gross fraud to allow the appellee to recall the gift after expenditures have been made on the faith of it.

The allowance to appellee, in the settlement of his account on the 11th day of November, 1861, for commissions on money in his hands during the year previous, is manifestly erroneous. The commissions allowed to guardians should be for services rendered and not for neglect of their duties.

In accordance with these principles we have restated the appellee's account, and find due from him the sum of nine hundred and seventy-five dollars, for which a decree with interest from the last day of the present term of this court, will be rendered with costs in this court.

*Decree in this court.*